IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENIQUE SMITH,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        Case No. 08-2375-JWL
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                    Defendant.          )
                                        )
_____)

## MEMORANDUM AND ORDER

Plaintiff Kenique Smith filed this suit aginst the United States of America for

damages stemming from a motor vehicle accident with a United States Postal Service

("USPS") delivery vehicle, driven by Mr. Chang Yim.  Ms. Smith asserts a cause of

action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et al*. ("FTCA"), claiming

that Mr. Yim negligently struck her vehicle while attempting to pull away from a curb,

resulting in injuries to her neck and back, and that the United States is liable for Mr.

Yim's negligent act.

A trial to the Court was held on this matter on December 8th and 9th of 2009.  The

Court has thoroughly considered the evidence and arguments presented at trial and is now

prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of

Civil Procedure 52(a).  For the reasons set forth fully below, the Court concludes that Mr.

Yim acted negligently, that his negligence caused the accident and Ms. Smith's injuries,

that the United States may be held liable under the FTCA for Mr. Yim's negligence, that

Ms. Smith's conduct did not contribute to the accident, that Ms. Smith could not have

avoided the accident, and that Ms. Smith did not act in any manner that would lead this

Court to conclude she failed to mitigate her damages. Therefore, the Court determines

that Ms. Smith is entitled to recover damages for her current and future medical expenses,

lost wages, and pain and suffering in the amount of $ 167,114.11.


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. <u>Findings of Fact</u>

A. Fault

*The Negligence of USPS Driver Chang Yim*

This case arises from a motor vehicle accident occurring on March 3, 2007 on

Everett Street in Kansas City, Kansas. Ms. Smith was assisting with a last-minute

purchase for a participant in the wedding of Ms. Smith's friend, Mr. John Wright. She

drove to Target to make the purchase and was driving back to Mr. Wright's home on

Everett Street when the accident occurred. Driving west on Washington Boulevard, Ms.

Smith entered a roundabout that led onto Everett Street. As she proceeded through the

roundabout, she noticed a USPS delivery truck parked alongside Everett. The truck was

not moving and did not have a turn signal on. As she proceeded west onto Everett, Ms.

Smith was driving at the legal speed limit, 20 miles per hour. She continued past the

delivery truck, seeing no indication it would move from its parked location along Everett.

Mr. Wright's home was only a couple houses down from where the delivery truck was parked.

As Ms. Smith drove past the truck, it pulled away from the curb and struck the right front end of her car. The resulting impact was forceful, but did not cause significant damage to either vehicle. Ms. Smith's car shifted a few feet away from where the initial impact occurred. Although Ms. Smith's body did not strike anything in her car as a result of the accident, she soon began feeling pain in her shoulders and back. She was therefore taken by ambulance to North Kansas City Hospital for treatment.

Mr. Chang Yim had been driving the delivery truck. He testified that he had followed all necessary procedures to ensure he could safely enter onto Everett before pulling the truck away from the curb. He stated that he looked in the mirrors, including his vehicle's side mirror, then turned on his turn signal[1] and shifted the delivery truck into drive. However, because there was another vehicle parked in front of his delivery truck, Mr. Yim diverted his attention from any approaching traffic in order to maneuver around the vehicle in front of him. Mr. Yim admitted at trial that he did not look back in his side mirror a second time before pulling out from the curb. He did not see Ms. Smith's vehicle until after the accident occurred.[2]

---

[1] Ms. Smith asserts that she never saw the delivery vehicle with a turn signal on. Regardless of whether Mr. Yim turned on the turn signal at the last moment, the Court concludes that he negligently failed to keep a lookout and to yield the right-of-way and that his activating the turn signal when he did came too late to give Ms. Smith warning of his impending movement.

[2] Mr. Yim testified that he moved the delivery truck back to the curb after the accident so as to avoid a traffic jam on Everett Street. Mr. John Wright testified that he came out of his home after the accident occurred, saw the scene, and spoke with Ms. Smith, who

Mr. Yim's supervisor, Mr. Richard Hershey, spoke with Mr. Yim and investigated the accident scene afterwards. Based upon his interactions with Mr. Yim and his prior experience as an accident investigator, Mr. Hershey testified that he believed Mr. Yim did not see Ms. Smith's car when he pulled away from the curb. The investigation conducted by the USPS also concluded that Mr. Yim was at fault, as the accident report stated that he had been "inattentive."[3] The parties stipulated that Mr. Yim received a traffic citation for failing to yield the right-of-way, for which he pled guilty.[4]

Based upon this testimony presented at trial, the Court finds that Mr. Yim diverted his attention after initially looking into his mirrors and that he pulled out from the curb without having checked a second time to ensure there were no oncoming vehicles. As a result, he did not see Ms. Smith's car approaching from behind. Due to this inattentiveness, Mr. Yim failed to properly keep a lookout and to yield to Ms. Smith's vehicle which was already upon the roadway. His failure to yield in turn directly caused the car accident with Ms. Smith. The Court also notes that the parties stipulated that Mr. Yim at the time of the accident was an employee of the United States and acting within the course and scope of his employment.

informed him that Mr. Yim was attempting to leave. According to Mr. Wright, Mr. Yim stated he needed to leave the scene, to continue delivering his mail and Mr. Yim attempted to pull his vehicle out in front of Ms. Smith's.

[3] Mr. Yim received mandatory retraining as a result of the accident. As such training would have been necessary regardless of whether the delivery driver had been at fault for the accident, the Court finds that Mr. Yim's retraining has no bearing upon the question of whether he acted negligently. The Court does, however, draw upon the statement in the USPS accident report that the accident was a result of Mr. Yim's inattentiveness.

[4] Although Mr. Yim's guilty plea does not conclusively establish his fault, it is relevant to the Court's analysis.

*The Comparative Fault of Ms. Smith*

According to the United States, Ms. Smith failed to exercise the "last clear chance" to avoid the accident. The government also asserts that Ms. Smith is also at fault for the accident due to her actions immediately prior. The government attempted to support this assertion at trial by presenting evidence that Ms. Smith was distracted at the time of the accident, pointing to telephone records demonstrating that Ms. Smith was talking on her cell phone while driving before the accident occurred. The government also contended that Ms. Smith had been "rushing" from Target to assist with the wedding preparations and that she had been speeding. However, the government presented no evidence to support its theory that Ms. Smith was distracted at the time the accident occurred or was otherwise at fault in any manner. It did not present any evidence that she had actually been speeding and, as counsel noted at closing argument, Ms. Smith had finished maneuvering a roundabout immediately prior to the accident, likely causing her to have been at a lowered rate of speed while entering onto and proceeding down Everett. In addition, her destination—Mr. Wright's home—was not far from the roundabout, so Ms. Smith would have had no reason to accelerate her speed significantly after coming through the roundabout. Moreover, Ms. Smith had not been using her cell phone at the time of the accident. Ms. Smith's cell phone records showed that she had made calls on her phone several times between 12:59 and 1:19, but there was a break in her phone usage from 1:19 to 1:25, with the accident occurring during this time. In addition, several witnesses presented testimony that the weather that day was clear and there were

otherwise no obstructions to Ms. Smith's vision when she negotiated the roundabout and entered onto Everett Street. The government did not present any evidence that Ms. Smith had an opportunity to avoid the accident, such as by swerving around the delivery truck. Based upon Ms. Smith's own testimony, the Court therefore concludes that she had no such opportunity.[5] There simply was no prior warning to Ms. Smith that the delivery vehicle would move from its parked location upon Everett.

## B. Damages

### The Injury

Immediately after the accident, Ms. Smith began feeling pain in her neck and shoulders. She was taken by ambulance to North Kansas City Hospital, where she received x-rays and pain medication. She visited with her regular physician, Dr. Amit Joshi, two days later. He referred her to physical therapy with Preferred Physical Therapy. She attended physical therapy there from mid-March until mid-April. Ms. Smith did experience improvement in her condition while participating in physical therapy at Preferred Physical Therapy, but she testified that the improvement was only for a short period of time and that the behavior of the therapists changed over time. She therefore notified Dr. Joshi that she no longer wished to attend physical therapy and Dr. Joshi instead referred her to a specialist in rehabilitative medicine, Dr. Reddy Katta.

Dr. Katta diagnosed Ms. Smith with chronic cervical, thoracic, and lumbar strain, right-sided radiculitis, radiographic evidence of degenerative disk disease of her cervical

---

[5] Ms. Smith also stated that she did not have the opportunity to avoid the accident.

and lumbar vertebrae, and tendonitis in the right shoulder. Dr. Katta also referred Ms. Smith to Dr. Coy for an epidural injection, which Ms. Smith testified did reduce her pain rather significantly, though for only a brief period of time (approximately 1 ½ to 2 months). She told Dr. Katta and testified that the epidural injection caused significant side effects, including loss of hair, weight gain, anxiety, and vivid dreams. Dr. Coy diagnosed Ms. Smith in essentially the same manner as Dr. Katta had.[6] On April 13, 2009, Ms. Smith visited with Dr. Steven Hendler, another specialist in rehabilitation who had been retained by the defense. Dr. Hendler similarly diagnosed Ms. Smith.[7] Ms. Smith, therefore, was diagnosed by each of the physicians she visited with chronic cervical strain and lumbar strain.[8]

As previously noted, Dr. Katta also diagnosed Ms. Smith with radiculitis, or as he explained, "pain down the arm." Ms. Smith was diagnosed with this condition solely due to her own complaints of pain. As Dr. Katta explained, a physician would diagnose a patient with "radiculopathy," rather than radiculitis, where there existed some objective, abnormal finding. As the defense pointed out, neither Dr. Katta nor Dr. Hendler found any objective basis to diagnose Ms. Smith with radiculopathy. However, neither physician concluded that Ms. Smith's complaints lacked any medical basis. Each

---

[6] Dr. Coy diagnosed Ms. Smith with cervical radiculitis and myofascial pain, and possibly some thoracic spondylosis. Dr. Katta testified that these diagnoses—while containing slightly different language—were essentially the same.

[7] Dr. Steven Hendler diagnosed Ms. Smith with cervical strain with chronic myofascial pain, lumbar strain, and limb pain. Dr. Katta noted that this diagnosis was similar to his own.

[8] Since the accident and diagnoses of these physicians, Ms. Smith's lumbar strain has resolved itself.

diagnosed Ms. Smith with chronic cervical strain and Dr. Hendler admitted during trial that Ms. Smith's myofascial pain[9] would provide a reasonable basis for the pain that she described.

Based upon the evidence presented and Ms. Smith's credible testimony at trial, the Court also finds that Ms. Smith did not exaggerate her symptoms or damages. As noted above, Ms. Smith attended physical therapy at Preferred Physical Therapy from mid-March until mid-April, immediately following the accident. One of the physical therapists Ms. Smith visited with, Jamie Lynn Dehan, concluded during her treatment of Ms. Smith that Ms. Smith's subjective reports did not match up with her objective findings at the physical therapy sessions. At trial, Ms. Dehan explained that the basis for her conclusion was that Ms. Smith was able to demonstrate full shoulder range of motion during exercise but was unable to do so when measured, indicating that Ms. Smith intentionally limited herself during measurement. Ms. Dehan also reported that Ms. Smith had exaggerated responses to palpation, as she had lesser responses when distracted. However, the physicians Ms. Smith visited with concluded that Ms. Smith had not exaggerated her symptoms or engaged in "symptom magnification." Dr. Katta testified that he never saw her do anything that qualified as symptom magnification and that he had no doubt she was not a symptom magnifier. Moreover, Dr. Hendler tested whether Ms. Smith exaggerated her symptoms by comparing whether her responses were the same to both superficial and deep palpations and concluded that there were no

---

[9] Myofascial pain is considered soft tissue pain. As Dr. Katta explained, myofascial pain is associated with "trigger points," or particularly sensitive areas.

differences in her responses, indicating that she did not exaggerate her complaints of pain. Lastly, the Court notes that while Ms. Dehan had a master's degree in physical therapy, she had been licensed for only nine months at the time she treated Ms. Smith in March 2007. In light of these facts, the Court finds credible Ms. Smith's testimony regarding the pain she has experienced as a result of the injuries received during the accident and the testimony of her physician, Dr. Katta, that he found no basis to conclude Ms. Smith had exaggerated her symptoms.

The government also asserted that Ms. Smith took actions that could constitute a failure on her part to mitigate damages. The government presented three bases for Ms. Smith's alleged failure to mitigate damages: (1) Ms. Dehan at Preferred Physical Therapy concluded Ms. Smith's compliance with an assigned home exercise regimen had been "poor" (2) Ms. Smith opted to forgo additional physical therapy at Preferred Physical Therapy despite improvement and (3) Ms. Smith opted to forgo additional epidural injections despite the fact that the one injection she received did significantly reduce her pain. First, the Court is not persuaded that Ms. Smith's alleged failure to do the requisite home exercises contributed to her damages. The government did not present evidence that Ms. Smith's damages were affected by her failure to do such exercises. In addition, Dr. Katta also instructed Ms. Smith to follow a home exercise program and he stated that Ms. Smith always did what he advised her to do. Second, while Ms. Smith did forgo further physical therapy sessions at Preferred Physical Therapy, the Court finds credible Ms. Smith's explanation that she did so not to avoid physical therapy but rather because she was not satisfied with her treatment at the particular location. Ms. Smith did not

refuse to attend physical therapy despite the instructions of her physician, such as in *Cox v. Lesko*, 953 P.2d 1033, 1036-37 (Kan. 1998). Rather, she explained the situation to her physician, who instead referred her to a specialist. Moreover, Ms. Smith attended physical therapy at another location after leaving Preferred Physical Therapy. In particular, she attended therapy sessions at Providence Medical Center after discontinuing her treatment at Preferred Physical Therapy. Third, Ms. Smith explained that while the epidural injection provided her relief from the pain, it did so only for one and a half to two months and she immediately began to suffer side effects such as hair loss, weight gain, and increased anxiety. Both Dr. Katta and Dr. Hendler testified that the epidural injection could cause some of these alleged side effects.[10] Therefore, Ms. Smith had a valid medical rationale for not continuing her epidural injections. Moreover, while Dr. Hendler explained that a battery of epidural injections might create permanent pain relief, there was no evidence to conclude that Ms. Smith's condition would have been permanently improved by additional injections. Dr. Katta indeed stated that he would not expect an epidural injection to cure the problem, but rather to merely provide some relief from the pain, for a time generally from three to six months.

In addition to the physical therapy session and one epidural steroid injection, Ms. Smith took ibuprofen, Lidoderm Patches, and Flexeril, a muscle relaxant. Ms. Smith testified that each of these medications provided her with some relief and that she either continued to take or would like to continue to take them were she financially able to do

_____

[10] He did also state that he would not expect it to create any emotional effects.

so.[11]  However, despite such medication, she is no longer able to enjoy or has had to limit some of her favorite pre-accident activities.[12]  For example, Ms. Smith has a passion for landscaping but has been unable to engage in this beloved activity.  She also testified that she is no longer able to enjoy swimming as she once had, and has had to limit the everyday household chores she performs, such as vacuuming and carrying a laundry basket.  Ms. Smith, described by her co-workers as a fashionable individual who always had on stylish high heels, is also no longer able to regularly wear high heels without suffering from pain and has therefore been forced to shift to wearing flat shoes, a change she clearly laments.

Ms. Smith's pain and inability to engage in such activities has also impacted her emotional well being.  The Court finds credible the testimony of Ms. Smith's co-workers who testified that her mood changed significantly after the accident.[13]  While she

---

[11] Ms. Smith testified that she could no longer take the Flexeril because of the expense but that she would like to do so in the future.

[12] Dr. Hendler testified that he could find no specific limitations upon the activities Ms. Smith could engage in from a medical standpoint.  He concluded, in other words, that Ms. Smith was "voluntarily" limiting the activities in which she engaged.  However, he explained that he would consider a limitation as "voluntary" where the patient could physically engage in the activity but chose not to do so because it caused the individual pain.  As Ms. Smith testified, she no longer engages in such activities because they cause her severe pain, albeit at times hours after she engages in the activity.  As explained further below, the pain she experiences is caused by injuries received during the accident, and Ms. Smith's limitation of activities to alleviate her pain may therefore be considered by the Court in assessing the nature and extent of her damages, regardless of whether Ms. Smith might be physically capable of performing the activities with the accompanying pain.

[13] Kevin Jones, Ronita Wilson, and Marcia Bazzle all testified as to the changes in Ms. Smith's disposition after returning to work in August 2007.  Mr. Jones also noted that Ms. Smith regularly walked around his floor in the office, a floor above her own, in order to exercise to decrease the pain she suffered.

previously had been a "bubbly" and "chipper" person who always had something positive to say, after the accident she increasingly talked to her co-workers about her pain and appeared depressed.  Ms. Smith indeed took depression medications after the accident for some period of time.  Although two of Ms. Smith's supervisors testified that they did not notice any change in her behavior after she returned to work, Ms. Smith explained that she had tried not to discuss the injuries with her supervisors in an attempt to separate her personal life from her professional life.  Moreover, Ms. Smith's co-workers all testified that she clearly tried to hide the pain she suffered from her supervisors and others.  The Court therefore finds that Ms. Smith did suffer emotional difficulties as a result of the pain she experienced.  However, Ms. Smith did concede at trial that the anxiety and emotional difficulties she suffered resulted partially from unrelated work issues[14] as well as the pain from her injuries and her inability to participate in preferred activities.

## II.  Conclusions of Law

This action was brought under the Federal Tort Claims Act, 28 U.S.C. §§1346(b), 2671, et. seq.  With certain exceptions, the FTCA provides the United States shall be liable in tort in the same manner and to the same extent as a private individual under like circumstances.  *See* 28 U.S.C. § 2674.  In a negligence claim brought under the FTCA, the court must apply the substantive law of the state where the negligent act occurred, to the extent it is not precluded by federal law.  *See Richards v. United States*, 369 U.S. 1, 9-

---

[14] Ms. Smith was terminated from his employment in November, 2007.  She did suffer from anxiety due to work related issues

10 (1962). Because the act of negligence occurred in Kansas City, Kansas, the law of the state of Kansas will govern all substantive issues in this case.

*Negligence*

In Kansas, a plaintiff attempting to prove negligence must demonstrate "the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered." *Deal v. Bowman*, 188 P.3d 941, 946 (Kan. 2008) (quoting *Nero v. Kansas State Univ*., 861 P.2d 768 (1993)). Negligence is "the failure of a person to do something that a reasonably careful person would do, or the act of a person in doing something that a reasonably careful person would not do, measured by all the circumstances then existing." *Id*. (quoting *Johnston v. Ecord*, 412 P.2d 990 (Kan. 1966)). Kansas uses a "reasonably prudent driver" standard to determine whether a driver acted negligently in operating a vehicle. *Id*.

Mr. Yim breached a duty of care when he pulled his delivery truck away from the curb and into Everett Street, colliding with Ms. Smith. Mr. Yim had a duty "to drive his car as a prudent driver would do." *Id*. (quoting *Drennan v. Penn. Casualty Co*., 176 P.2d 522 (Kan. 1947)). In particular, he had a duty to keep a lookout and to yield the right-of-way to approaching vehicles before entering the lane of traffic. *See* Kan. Stat. Ann. 8-1529 (1974) ("the driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right-of-way to all vehicles approaching on the roadway to be entered or crossed.") *See also Kelty v. Best Cabs, Inc*., 481 P.2d 980, 984 (Kan. 1971) (taxicab driver violated K.S.A. 8-1529 where the cab was not in motion and

was sitting in a private driveway alongside the street, and the driver suddenly drove into the street, striking a car passing by on the road).  As noted above, Mr. Yim diverted his attention away from the roadway while he shifted into gear and maneuvered around the vehicle parked immediately in front of his truck and he did not look a second time to ensure there were no vehicles approaching.  By failing to ensure that the road was clear of oncoming vehicles before fully moving the delivery truck onto the roadway, Mr. Yim failed to act as a prudent driver would do.  *See id.* (concluding that the taxicab driver failed to yield the right of way despite his testimony that he looked to the roadway once and saw the oncoming vehicle at a "distance" before finding out where his passenger wished to go and pulling out into the roadway).  As the United States stipulated that Mr. Yim was at the time of the accident an employee of the United States and acting within the course and scope of his employment, the United States may properly be held liable for his negligence.

Ms. Smith may not recover, however, unless the accident caused the injuries for which she seeks recovery.  *See Allman v. Holleman*, 667 P.2d 296, 300-301 (Kan. 1983) (noting that proximate cause of an injury is a prerequisite for finding negligence liability). As the Kansas Supreme Court has explained:

> The proximate cause of an injury is the cause that in a natural and continuous sequence, unbroken by any superceding cause, both produced the injury and was necessary for the injury.  The injury must be the natural and probable consequence of the wrongful act.  Individuals are not responsible for all *possible* consequences of their negligence, but only those consequences that are *probable* according to ordinary and usual experience.

*Hale v. Brown*, 197 P.3d 438, 440 (Kan. 2008) (internal citations omitted) (emphasis in original).

Mr. Yim's failure to yield the right of way caused the collision with Ms. Smith and produced her injuries. The physicians who treated Ms. Smith all concluded that she suffered from chronic cervical strain and myofascial pain, pain which stemmed from the accident with Mr. Yim. Moreover, Dr. Katta explained that an automobile accident could result in injuries leading to the myofascial pain experienced by Ms. Smith. While the government initially stated that it would present evidence that Ms. Smith suffered from a pre-existing condition, the government failed to present such evidence and the Court finds credible Ms. Smith's testimony that the pain she experienced exclusively stemmed from the regions in which she was injured as a result of the accident. Thus, the Court concludes that proximate causation exists and finds that Ms. Smith has established the critical elements of her negligence claim.

*Comparative Negligence*

The government contends that Ms. Smith should be wholly denied recovery or that her damages award should at least be reduced, because she had been distracted at the time of the accident and therefore was at least partially responsible for its occurrence and because she failed to exercise the "last clear chance" to avoid the accident by swerving out of the way.[15] Kansas uses the theory of comparative negligence to assess damage

---

[15] In its trial memorandum, the government also asserts that the Court should consider Ms. Smith's failure to do all requisite home exercises assigned by Preferred Physical

awards in negligence claims.  Under Kansas law, the plaintiff's contributory negligence will not bar her recovery so long as her negligence is "less than the causal negligence of the [defendant]."  Kan. Stat. Ann. § 60-258a(a) (1994).  Rather, the award of damages to a negligent plaintiff is "diminished in proportion to the amount of negligence attributed to such party."  *Id*.  Therefore, Ms. Smith would be barred from recovering damages if her negligence contributed to her injuries in an amount equal to or more than the negligence of Mr. Yim.  If Ms. Smith were to be found partially at fault for her injuries, but less than fifty percent at fault, her damage award would be reduced by the percentage her negligence contributed to her injuries.

However, as explained above, the government failed to present sufficient evidence to persuade the Court that Ms. Smith bore any fault for the accident with Mr. Yim. Moreover, Ms. Smith did not have any warning that Mr. Yim would move the truck from its parked location along Everett Street and she therefore had no opportunity to swerve to avoid the accident.  Under Kansas law, a motorist may assume that other motorists will observe the law and is not negligent for acting based upon that assumption "unless and until he had knowledge to the contrary."  *Jones v. Spencer*, 553 P.2d 300, 304 (Kan. 1976) (citing *Logan v. McPhail*, 494 P.2d 1191, 1196 (Kan. 1972)).  Ms. Smith therefore

---

Therapy and her failure to continue physical therapy for purposes of comparative fault. Regardless of whether such matters would in fact be an appropriate consideration for comparative fault purposes*, see Cox v. Lesko*, 953 P.2d 1033 (Kan. 1998), the Court rejects the factual basis for the government's claim.  In particular, the Court concludes that Ms. Smith did not commit any acts that could constitute a failure on her part to mitigate damages with regard to her physical therapy.  Specifically, the Court found that the government had not demonstrated that Ms. Smith's failure to perform all physical therapy exercises contributed to her injuries and also that Ms. Smith did not attempt to avoid physical therapy but rather attended therapy at another location.

was entitled to assume that the USPS delivery truck would not be moved from its parked location without the driver having properly kept a lookout and yielding to any oncoming vehicles. As a result, Ms. Smith did not commit any negligent act and the Court therefore cannot reduce Ms. Smith's damage award based upon the concept of comparative negligence.

*Damages*

Ms. Smith sought damages for her current and future medical expenses, for lost wages, and for her pain and suffering. The government contends that Ms. Smith's damages award should be reduced because Ms. Smith failed to mitigate her damages in that she (1) did not comply with the home exercise regimen prescribed by Preferred Physical Therapy, (2) she decided not to attend physical therapy at Preferred Physical Therapy after mid-April, despite improvements in her condition, and (3) she chose not to receive additional epidural injections though the one she received provided her temporary relief. However, the Court concludes that none of these reasons provide a basis to conclude that Ms. Smith failed to mitigate her damages.

In Kansas, an individual injured by the negligent acts of another has a duty to make reasonable efforts to mitigate his damages "and recovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable effort without undue risks, expense, or humiliation." *Home Life Ins. Co. v. Clay*, 773 P.2d 666, 674 (Kan. App. 1989) (citing *First Nat'l Bank v. Milford*, 718 P.2d 1291 (1986)). However, his duty to mitigate damages "is not an unlimited one," and he is "required

only to exert reasonable efforts to prevent or minimize his or her damages within the bounds of common sense." *Leavenworth Plaza Assocs., L.P. v. L.A.G. Enterprises*, 16 P.3d 314, 317 (Kan. App. 2000). The burden of proving mitigation "rests upon the party asserting it." *Kelty v. Best Cabs, Inc.*, 481 P.2d 980, 985 (Kan. 1971) (citing *Rockey v. Bacon*, 470 P.2d 804 (Kan. 1970)). Here, the United States has failed to satisfy its burden. The government did not present any evidence to indicate that Ms. Smith's alleged failure to perform the home exercises assigned to her at Preferred Physical Therapy contributed to her injuries. Ms. Smith also followed all instructions of her physician, Dr. Katta, including home exercises. In addition, while she chose not to attend further physical therapy sessions at Preferred Physical Therapy, she was dissatisfied with the service she received at that location and instead attended physical therapy elsewhere. Her decision not to participate in physical therapy at the same initial location does not qualify as a failure on her part to mitigate damages and her continued participation in physical therapy elsewhere demonstrates that she continued to exert reasonable efforts to minimize her damages. Lastly, her decision not to continue epidural injections does not constitute a failure to mitigate her damages as she suffered serious side effects from the epidural injections and she was not required to unreasonably undergo treatments that caused her such side effects for the temporary relief she received from the initial injection. There was also no evidence to suggest that Ms. Smith's condition would likely have been permanently improved by several epidural injections. Indeed, there was evidence to the contrary, implying that epidural injections would likely provide only temporary relief. In light of the harmful side effects of the epidural injections that Ms.

Smith experienced, the Court concludes that her failure to undergo additional injections does not constitute a failure to mitigate damages. As the Court therefore rejects all of the bases the government presented for finding that Ms. Smith did not mitigate her damages, the Court concludes that her damages award should not be reduced based upon such a theory.

Lastly, the Court must assess the appropriate amount of the damages award. Ms. Smith sought $23,658.75 for her current medical expenses and the parties stipulated that her asserted medical bills were reasonable and customary charges for the rendered services. She also sought $25,000 for future medical expenses, calculated based upon her future need for muscle relaxants (particularly Flexeril),[16] Lidoderm patches,[17] ibuprofen,[18] and physical therapy.[19] She sought lost wages for the time she was required to take off of work to recover from her injuries in the amount of $18,455.36. This included 107 days off of work between March 5, 2007 and August 13 of the same year, calculated at a rate of $21.56 per hour. The parties did not dispute the amount of time Ms. Smith took off work nor the reasonableness of this sum. As the parties concurred in the estimation of these costs, the Court finds it appropriate to award Ms. Smith the full

[16] Ms. Smith calculated that she would need a bottle of 60 Flexeril pills four times per year, at a cost of $203.99 per bottle.

[17] Ms. Smith calculated the cost of Lidoderm patches at $449.99 for 60 patches, and stated that she would need a box of 60 patches twice per year.

[18] Ms. Smith calculated the costs for ibuprofen at $20 per month. Dr. Katta testified that Ms. Smith may continue to suffer from the current level of pain she experiences well into the future, and perhaps for her entire life. Therefore, Ms. Smith may continue to need the ibuprofen for the rest of her life.

[19] Ms. Smith estimated that she would need physical therapy approximately every two years, at a cost of $3500 per session.

requested amount for these categories of damages.  The Court also notes that the amount sought by Ms. Smith for future medical expenses is a conservative sum, because there is no indication that the pain and suffering Ms. Smith experiences will improve over time. Dr. Katta explained that while Ms. Smith may recover from her injuries, particularly given her youth, she may continue to feel such severe pain well into the future, and perhaps for her entire lifetime.  The parties stipulated that the average life expectancy of a thirty year old black female such as Ms. Smith is 47.2 years.  Given the great length of time that Ms. Smith may therefore continue to suffer from her injuries, the amount needed to pay for her future medical expenses may indeed turn out to be much higher than the requested $25,000.

Ms. Smith also requested damages for her pain and suffering.  The Court concludes that Ms. Smith should receive $100,000 for her present and future pain and suffering.  This amount is an appropriate sum considering that Ms. Smith suffers three to four times per month from severe pain and headaches, and two to three times per week from less excruciating yet still burdensome pain.  While Ms. Smith's injuries did not incapacitate her, they are nonetheless significant and prevent her from participating in activities she is very fond of, such as landscaping and swimming.  Moreover, she is no longer able to regularly wear fashionable high heels as she once enjoyed doing, and her ability to assist with daily chores has been significantly hindered.   While the Court recognizes that Ms. Smith's changed disposition and depression after the accident resulted not merely from the injuries she suffered but also from unrelated work difficulties, Ms. Smith clearly did suffer an emotional toll from the constant physical pain

and her inability to engage in certain activities.  As her physical pain may continue for a significant period of time in the future, and indeed may never cease, the Court finds it appropriate to award her damages to encompass her future suffering as well, in the total amount of $100,000.

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment be entered in favor of Plaintiff Kenique Smith against Defendant United States of America in the amount of $167, 114.11.

**IT IS SO ORDERED** this  18th  day of December, 2009.

_**s/ John W. Lungstrum**_
John W. Lungstrum
United States District Judge